**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

INMAR BRAND SOLUTIONS, INC.,    )
                                     )
        Plaintiff,              )
                                     )
           v.                  )  Civil Action No.: _____
                                     )
QUOTIENT TECHNOLOGY INC.,      )  **DEMAND FOR JURY TRIAL**
                                   )
        Defendant.          )
                                   )

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Inmar Brand Solutions, Inc. ("Inmar" or "Plaintiff"), through its attorneys, for its Complaint against Quotient Technology Inc. ("Quotient" or "Defendant"), alleges as follows:

## THE PARTIES

1.      Plaintiff Inmar is a corporation organized and existing under the laws of the State of North Carolina having a principal place of business at 1 W. 4th Street, Suite 500, Winston-Salem, North Carolina 27101.

2.      Defendant Quotient is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business located at 1260 East Stringham Avenue, Suite 600, Salt Lake City, Utah 84106.

## JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, Title 35 of the United States Code. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1338(a).

4.      Defendant Quotient is subject to this Court's specific and general personal jurisdiction consistent with due process and the Delaware Long Arm Statute, 10 Del. C. § 3104.

5.     Defendant Quotient Technology Inc. has appointed Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808, as its registered agent in Delaware.

6.     Defendant Quotient is subject to the Court's personal jurisdiction, in part, because it regularly conducts and solicits business, or otherwise engages in other persistent courses of conduct in this district, and/or derives substantial revenue from the sale and distribution of infringing goods and services provided to individuals and businesses in this district.

7.     This Court has personal jurisdiction over Defendant Quotient because, *inter alia*, Defendant (1) has substantial, continuous, and systematic contacts with this State and this judicial district; (2) enjoys substantial income from its operations and sales in this State and this judicial district; (3) employs Delaware residents in this State and this judicial district; and (4) solicits business and market products, systems and/or services in this State and judicial district including, without limitation, those related to the infringing accused products.

8.     For example, Quotient, either directly, or indirectly through its digital promotions network and platforms, has transacted and/or continues to transact business in Delaware, and has regularly solicited and continues to regularly solicit business in Delaware. Quotient has also engaged in substantial activity within the District and derives substantial revenue from goods or services provided to retailers, advertisers, manufacturers, and individuals in Delaware. For example, Quotient activates billions of coupons at tens of thousands of retail locations throughout the country, including in the State of Delaware, through platforms integrated with Delaware retailers' point of sale systems; Quotient provides a digital platform that manages coupons and connects retailers, manufacturers, and shoppers through a shared network reaching over 50,000,000 digitally active consumers throughout the United States, including in the State of Delaware; and Quotient delivers promotions from over

2,000 leading US advertisers through digital retailer platforms throughout the United States, including in the State of Delaware.

9.      Quotient's business also depends on its ability to maintain and scale the network infrastructure necessary to operate its platforms, including websites and mobile applications, which are accessible by and targeted to consumer and business clients in the State of Delaware and in this Judicial District.

10.      Quotient also owns and operates online sites and applications, including Shopmium and Coupons.com, which integrate infringing functionalities and systems, and which offer for sale, and sell, infringing Quotient products and services to customers within this Judicial District.

11.      Venue in this Judicial District is proper under 28 U.S.C. § 1400(b) because Defendant has committed acts of infringement in Delaware and Defendant Quotient is incorporated in Delaware.

## FACTUAL ALLEGATIONS

### About Inmar

12.      At Inmar's predecessor company's inception in 1980, the coupon industry largely relied on manual processing and its founder had a novel idea that would ultimately revolutionize coupon processing—leveraging technology to bring speed, automation and accuracy to the complicated process of managing coupons, making it easier for retailers to get paid, brands to track effectiveness, and consumers to save money.

13.      Inmar and its affiliates have continued to leverage technology to create client-focused solutions for promotion, supply chain, and health care, including developing their own innovations to improve efficiencies, minimize fraud, and elevate the overall consumer experience.  Inmar has applied for and received patents in the United States that describe aspects of Inmar's innovations.

14.     Additionally, Inmar licenses technology to improve the products and services it provides to consumers and businesses alike. For example, Inmar is the exclusive licensee of automated, end-to-end coupon and promotion processing technology developed by Intelligent Clearing Network, Inc. ("ICN"), including the patent-protected technologies of the Patents-in-Suit, which are described further below.

15.     The ICN inventions contained in the Patents-in-Suit relate to groundbreaking improvements to coupon processing efficiency, speed, and security. The techniques ICN developed are described in the Patents-in-Suit and relate to coupon processing networks and have particular application in the coupon validation, redemption, and financial settlement industries, digital promotions environments, and coupon data and analytics services, as will be further described below.

### The Patents-in-Suit

16.     Plaintiff is the exclusive licensee of all rights and interest in United States Patent Nos. 10,846,729 ("the '729 Patent"), 9,070,133 ("the '133 Patent"), and 9,098,855 ("the '855 Patent") (collectively the "Patents-in-Suit"); including all rights to enforce and prosecute actions for infringement and to collect damages for all relevant times against infringers of the Patents-in-Suit. Accordingly, Plaintiff possesses the exclusive right and standing to prosecute the present action for infringement of the Patents-in-Suit by Defendant.

### U.S. Patent No. 10,846,729

17.     On November 24, 2020, the U.S. Patent and Trademark Office duly and lawfully issued United States Patent No. 10,846,729 ("the '729 Patent"), entitled "Intelligent Clearing Network." A true and correct copy of the '729 Patent is attached hereto as **Exhibit 1**.

18.    Inmar is the exclusive licensee of all rights and interest in and to the '729 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

19.    The '729 Patent describes, among other things, novel methods and systems that improve the process of validating, clearing and financially settling coupons, using a real-time intelligent clearing network, allowing for more efficient, less error-prone and more convenient coupon processing.

20.    These inventive technological improvements solved then-existing problems in the field of coupon processing.  For example, prior to the invention of the '729 Patent, coupon processing relied primarily on manual clearing and settlement process of paper coupons, requiring a slow, fraud-prone and labor-intensive process before the retailer was reimbursed for the value of the coupon and the cost of the paper coupon.  For example, this physical paper coupon clearing process was not only slow and manual, but also sometimes required a second independent count of each paper coupon before a retailer is reimbursed.  Another problem with the then-existing paper clearing and settlement process was the issue of disputes and charge backs by the manufacture for the value of the redeemed paper coupon to the retailer for paper coupons which the retailer redeemed, but should not have because the coupons were invalid in some way, such as coupons redeemed after an expiration date. Yet another problem was that retailers would redeem coupons that had been impermissibly copied, thereby monetizing coupons in excess of the number of coupon offers which the manufacturer had made available for redemption.  (*See* Ex. 1, 1:27-62).

21.    The '729 Patent overcomes these drawbacks and improves the functioning of coupon processing systems, for example, by describing novel and inventive systems in which coupons are validated, redeemed and financially settled using an intelligent clearing network, a point-of-sale

terminal, a point-of-sale controller, an intelligent clearing network server, an intelligent clearing network database, and an intelligent clearing network master coupon table. The '729 Patent describes novel systems in which the point-of-sale terminal is configured to transmit specific types of coupon data, such as data elements read from a GS1 barcode, directly to the intelligent clearing network server, via the intelligent clearing network server, for coupon redemption, validation, and financial settlement at the intelligent clearing network server.

22.     In one aspect, the '729 Patent describes an improved coupon processing system in which a point-of-sale terminal scans a coupon, reading GS1 data elements which include universal product code information, and those data elements are transmitted through the intelligent clearing network from the point-of-sale terminal to an intelligent clearing network server. If the intelligent clearing network validates the GS1 data elements, the server transmits coupon related information through the network to the point-of-sale terminal. (Ex. 1, at 2:23-31). The claims of the '729 Patent are directed to specific techniques and apparatus, using an intelligent clearing network, to validate, redeem and financially settle coupons in real time, providing a convenient, fast, auditable, and comprehensive financial settlement process, while eliminating potential fraud and the need for manually counting and validating each paper coupon redeemed. (Ex. 1, at 1:66-4:48; 52:34-56:22).

23.     For example, Figures 8A and 8B are schematic block diagrams illustrating one concept of the process of generating and redeeming a coupon card:



FIG.8A

FIG.8B

**U.S. Patent No. 9,070,133**

24.    On June 30, 2015, the U.S. Patent and Trademark Office duly and lawfully issued United States Patent No. 9,070,133 ("the '133 Patent"), entitled "Intelligent Coupon Network."  A true and correct copy of the '133 Patent is attached hereto as **Exhibit 2**.

25.    Inmar is the exclusive licensee of all rights and interest in and to the '133 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

26.    The '133 Patent describes, among other things, novel methods and systems for redeeming coupons that utilize novel ways of bundling technologies, such as real time communications and large volume data processing facilities, into a functioning operational platform. The inventions of the '133 Patent improve the efficiency, accuracy and speed of clearing coupons, while also improving the speed with which vital market intelligence from the redemption of coupons

is delivered to retailers and manufacturers, thus improving the process by which companies realize the benefits of coupon data analytics.

27.    These inventive technological improvements solved then-existing problems in the field of coupon processing.  For example, prior to the invention of the '133 Patent, coupon processing consumers spent considerable time and labor manually clipping and organizing coupons, while manufacturers and retailers would expend substantial resources to manually clear the coupons. Another problem with the then-existing coupon processing systems was that retailers and manufacturers might wait for weeks to receive critical information from a market segment or a particular promotion that may inform company strategy, provide the company with a competitive advantage and/or deliver industry insights that drive future promotions or decisions.  While market intelligence may have been contained in extended barcodes, that information was not quickly communicated to manufacturers and advertisers by then-existing technologies.  Yet another problem was that mistakes in printing of coupons could last for the duration of a promotion, which on a larger scale, could be very costly for manufacturers and/or retailers.  (See Ex. 2, 1:11-34; 8:62-65).

28.    The '133 Patent overcomes these drawbacks and improves the functioning of coupon processing systems, for example, by describing novel and inventive systems that allow for automatic processing of coupons, providing a linkage between a coupon card and coupon information that is stored in a centralized database, distributing information associated with coupon cards, and integrating technology for reading and transmitting such data from the retailer point-of-sale, enabling the speedy dissemination of coupon redemption data to interested advertisers and manufacturers.

29.    In one aspect, the '133 Patent describes an improved coupon processing system in which a point-of-sale terminal is communicatively coupled to an intelligent coupon network, the point-of-sale terminal is configured to read, process, format and transmit specific data from a coupon

card across the network, and a coupon processing server is configured to receive, interpret and validate the coupon data of the coupon card.  According to one aspect of the '133 Patent inventions, the coupon card can be configured to store and transmit useful data for not only one-time coupon validation or the duration of a single promotion, but also as an updateable card, which, for example, a manufacturer may update to provide additional coupon offers to a consumer.  (Ex. 2, at 1:45-52; 3:61-4:6).  For example, a coupon card may integrate coupon card memory and an antenna which facilitates the reading and transmission of data between the card and a reader employing Radio Frequency Identification ("RFID") technology or other electromagnetics technology, such as Radio Frequency Data Communication ("RFDC"), enabling real time communication and distribution of coupon data or promotions, as well as the relay of coupon redemption data.  (Ex. 2, at 5:4-43).

30.    The claims of the '133 Patent are directed to specific techniques and apparatus, using an intelligent coupon network, to automatically and conveniently process coupons and enable the receipt of real time, comprehensive market intelligence through integrated systems and communications among scanned coupon cards, a centralized database and an intelligent coupon network server.  (Ex. 2, at 1:38-2:14; 11:57-16:57).

31.    For example, Figure 1 is a schematic block diagram illustrating one concept of the system for redeeming coupons:



**FIG.1**

**U.S. Patent No. 9,098,855**

32.    On August 4, 2015, the U.S. Patent and Trademark Office duly and lawfully issued United States Patent No. 9,098,855 ("the '855 Patent"), entitled "Intelligent Clearing Network."  A true and correct copy of the '855 Patent is attached hereto as **Exhibit 3**.

33.    Inmar is the exclusive licensee of all rights and interest in and to the '855 Patent, including the right to assert all causes of action arising under said patent and the right to any remedies for infringement of it.

34.    The '855 Patent describes, among other things, novel methods and systems for the distribution and electronic processing of coupons and/or incentives, and in particular, an intelligent clearing network based system and method for validating and redeeming coupons, promotions and

incentives, allowing for more efficient, less error-prone and more convenient coupon processing, and making comprehensive marketing intelligence quickly available to advertisers and manufacturers upon coupon redemption, thus improving the process by which companies realize the benefits of coupon or promotion data analytics.

35.     These inventive technological improvements solved then-existing problems in the fields of coupon processing.  For example, prior to the invention of the '855 Patent, coupon processing consumers spent considerable time and labor manually clipping and organizing coupons, while manufacturers and retailers would expend substantial resources to manually clear the coupons. Another problem with the then-existing coupon processing systems was that manufacturers and advertisers might wait for weeks to receive critical information from a market segment or a particular promotion that may inform company strategy, provide the company with a competitive advantage, and/or deliver industry insights that drive future promotions or decisions.  While market intelligence may have been contained in extended barcodes, that information was not quickly communicated to manufacturers and advertisers by then-existing technologies.  Yet another problem was that mistakes in printing of coupons could last for the duration of a promotion, which on a larger scale, could be very costly for manufacturers and/or retailers.  (*See* Ex. 3, 1:11-34; 8:62-65).

36.     The '855 Patent overcomes these drawbacks and improves the functioning of coupon processing systems, for example, by describing novel and inventive systems in which coupons are validated, redeemed and financially settled using an intelligent clearing network, a point-of-sale terminal, a point-of-sale controller, and an intelligent clearing network server.  One aspect of the invention describes the transmission of coupon and/or incentive related information from the point-of-sale terminal to the point-of-sale controller for coupon redemption and validation through the network at the intelligent clearing network server.  In one aspect of the invention, the coupon and/or

incentive related information includes universal product codes contained in a transaction, wherein these data are used by the intelligent clearing network server to validate the coupon or incentive related information, and communicate that validation through the network to the terminal. (Ex. 3, at 1:50-2:3).

37.    In one aspect, the '855 Patent describes an improved coupon processing system in which trigger and target universal product codes are transmitted over an intelligent clearing network to automatically validate or reject a coupon or incentive, and further used to communicate the attempt or success of a coupon redemption to a manufacturer. For example, a manufacturer may have an in-store or online or mobile device promotion, which displays or advertises products on promotion or at a discounted price. The promotional information may come from a manufacturer which sets up sale or discounted price information and interacts with the invention's intelligent clearing network promotion manager, such as a web application, to store this promotion information in the intelligent clearing network database. When the consumer checks out at a retailer's point-of-sale terminal, the consumer's products with universal product codes are scanned or entered at the point-of-sale terminal. The point-of-sale terminal may format a promotion request message and send the universal product codes of scanned (or manually inputted) products to the intelligent clearing network promotion redemption real time service, which can be running on the intelligent clearing network server. The intelligent clearing network promotion redemption service can then compare the universal product codes sent in the promotion request message to all active promotions defined by the manufacturer on the intelligent clearing network database. If there is any active promotion where the universal product codes contained within the promotion request message satisfy the requirements of that promotion, the intelligent clearing network promotion redemption service can format a promotion request response message that includes the target universal product code number of the product the

manufacturer coupon should be applied to, and send that response back to the intelligent clearing network bridge software installed on the retailer's point-of-sale terminal. The retailer's point-of-sale terminal can then attempt to redeem the manufacturer coupon against the target universal product code contained in the promotion request message. The intelligent clearing network software can then generate a confirmation message regarding the success of the coupon redemption process. That redemption confirmation message can be further transmitted to the intelligent clearing network server, enabling the manufacturer to obtain the benefits of coupon redemption data, for example competitive intelligence or promotion success, in a fast, efficient manner. (Ex. 3, at 17:38-18:28).

38.     The claims of the '855 Patent are directed to specific techniques and apparatus, using an intelligent coupon network, to automatically and conveniently process coupons and enable the receipt of real time, comprehensive market intelligence through integrated systems, including, for example, communications among a point-of-sale terminal controller, a centralized database and an intelligent coupon network server, using universal product codes contained in a point-of-sale transaction. (Ex. 3, at 3:61-4:16; 28:37-34:37).

39.     For example, Figure 10 is a schematic block diagram illustrating one concept of the process of automatically redeeming a coupon or incentive related information using trigger and target universal product codes over a network, and transmitting a confirmation thereof back to the manufacturer:



FIG.10

## Quotient's Infringing Technologies

40.    As described further below, Quotient employs, offers to sell, and/or sells at least the following products and services that infringe the Patents-in-Suit, namely the Quotient Promotions Platform, Quotient Digital Promotions, Quotient Promotions Network, Quotient's Retailer Promotions Platform, Quotient Consumer Properties, including Shopmium and Coupons.com, Quotient's Omnichannel Platform, Quotient Analytics, and Quotient's Retailer iQ (collectively, the "Accused Products").

41.    Since at least July 12, 2023, Quotient has had actual notice of the Patents-in-Suit, and actual notice that Quotient products and services embody and/or perform the inventions of the Patents-in-Suit.  On July 12, 2023, Gary Oakley, the Chairman of Intelligent Clearing Network, sent a notice letter to Matthew Krepsik, the Chief Executive Officer of Quotient, via Federal Express (the

"Notice Letter"), which documented Quotient's infringement of the Patents-in-Suit. The Notice Letter informed Quotient that Quotient's products and services—including the Quotient Promotions Platform, Quotient Digital Promotions, Quotient Promotions Network, Quotient's Retailer Promotions Platform, Quotient Consumer Properties, including Shopmium and Coupons.com, Quotient's Omnichannel Platform, Quotient Analytics, and Quotient's Retailer iQ (the "Accused Products")—infringed claims of the Patents-in-Suit.

42.     On information and belief and based upon a reasonable inquiry, Quotient never responded to Intelligent Clearing Network's Notice Letter.

43.     As described herein, Quotient has continued to infringe even after being notified of its infringement.

## FIRST COUNT
## (DIRECT AND INDIRECT INFRINGEMENT OF U.S. PATENT NO. 10,846,729 UNDER 35 U.S.C. § 271(a), (b) and (c) – QUOTIENT TECHNOLOGIES)

44.     Inmar incorporates by reference all of the allegations set forth in Paragraphs 0-43 of this Complaint as though fully set forth herein.

45.     Quotient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '729 patent (including without limitation claim 10) in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling, in this District and elsewhere in the United States, the Accused Products.

46.     Quotient's promotions platforms and technologies, including the Accused Products, infringe at least claim 10 of the '729 patent. For example, Quotient's Digital Promotions architecture uses master databases across datacenters, which include "[a]n ICN server comprising a processor; and a memory including computer program code, the memory and the computer program code configured to, with the processor" (the '729 Patent, Claim 10, at 53:41-44) perform coupon processing and validation functions, for example, "both real time and batch processing of all coupon

clips and redemptions." *See* How Quotient uses MariaDB to help customers save money, *available at*  https://mariadb.com/openworks/sessions-on-demand/how-quotient-uses-mariadb-to-help-customers-save-money/.  *See, e.g., id., available at*  https://www.slideshare.net/MariaDB/how-quotient-uses-mariadb-to-help-customers-save-money::



47.    Quotient uses a combination of public and private cloud computing platforms, wherein its private cloud technology infrastructure is hosted across data centers.  Quotient uses at least one intelligent clearing network server.  For example, each Quotient data center is designed to "handle more than [its] server needs…"  *See, e.g.*, Quotient Annual Report, Form 10K, December 31, 2020, *available at*  https://www.sec.gov/Archives/edgar/data/1115128/000111512821000005/quot-20201231.htm:

*Scalable infrastructure*.    We use a combination of proprietary and open-source software to achieve a horizontally scalable, global, distributed and fault-tolerant architecture, with the goal of enabling us to ensure the continuity of our business, regardless of local disruptions. Our computational infrastructure currently processes millions of events per day and is designed in a way that enables us to add significant capacity to our platforms as we scale our business without requiring any material design or architecture modifications. We use a combination of public and private cloud computing platforms. Our private cloud technology infrastructure is hosted across data centers in co-location facilities in California and Virginia.

*Redundancy*.    Our critical production infrastructure utilizes a hot failover configuration which allows us to switch server loads, be it a single server or an entire data center, to the other data center within minutes. Data is continuously replicated between sites, and multiple copies at each site provide fast recovery whenever it is requested. Each data center has been designed to handle more than our entire server needs, which enables us to perform platform maintenance, business resumption and disaster recovery without any customer impact.

48.    Quotient's digital promotions architecture uses "traditional Lambda Architecture for both real time and batch processing of all coupon clips and redemptions" and uses a distributed cache to look up coupon metadata and coupon publishing metadata –MariaDB (database as a service) is Quotient's primary source of this metadata.  *See* How Quotient uses MariaDB to help customers save money.

49.    Quotient's promotions platforms and technologies, including the Accused Products, include computer program code configured to cause the ICN server to "receive, at an ICN server, first coupon or incentive information, including universal product code information of an item to be purchased at a retail business, the first coupon or incentive related information having been input to a terminal in the retail business, the ICN server being at a location that is remote from the retail business[.]"  *See* '729 Patent, Claim 10, at 53:45-51.  For example, as described above, Quotient application users can clip digital coupons in the application and the user may use the phone at the POS terminal to have the data elements associated with clipped coupons scanned at the POS terminal. *See* How Quotient uses MariaDB to help customers save money.  Then, "[t]he retailer uses [Quotient's] couponing services to look up the user and the coupons clipped and gives instant discounts redeeming the coupons directly at the POS…"  *Id.*  Quotient's Digital Promotions database cluster processes "~15,000 peak requests per seconds," and Quotient's Digital Promotions

architecture handles "millions of API calls per hour" from retailers' POS terminals. *Id.* The data elements used by Quotient for validation and redemption include GS1 coupon code information which may include the universal product code of the barcode information from a product to be purchased. *See, e.g.*, Quotient Technology Service-Specific Terms. Quotient's ICN server is at a location that is remote from the retail business. For example, Quotient Digital Promotions technology infrastructure and platforms are hosted across data centers in co-location facilities in California and Virginia. *See* Quotient Technology, 10-Q August 9, 2023 Quarterly Report, *available at* https://investors.quotient.com/sec-filings/sec-filings-details/default.aspx?FilingId=16847141.

50.    The Quotient promotions platforms and technologies, including the Accused Products, include computer program code configured to cause the ICN server "to validate, at the ICN server, the first coupon or incentive related information by performing a comparison of the first coupon or incentive related information based at least in part on the universal product code information[.]" *See* '729 Patent, Claim 10, 53:52-55. For example, "[t]he retailer uses Quotient's couponing services to look up the user and the coupons clipped[,]" and Quotient performs "real time and batch processing of all coupon clips and redemptions[,]" "giv[ing] instant discounts[,] redeeming the coupons directly at the POS[.]" *See* How Quotient uses MariaDB to help customers save money. Quotient uses "a distributed cache to look up coupon metadata and coupon publishing metadata" and uses MariaDB as its "primary source of this metadata. …MariaDB connections use an optimized connection pooling library to use persistent connections to the databases. *Id.* The transactions go through the messaging pipelines for batch processing and for downstream systems." *See id.*

51.    The Quotient promotions platforms and technologies, including the Accused Products, include computer program code configured to cause the ICN server "to transmit from the ICN server, in response to validation of the first coupon or incentive related information, coupon or incentive

codes triggered by the validation of the first coupon or incentive related information, the coupon or incentive codes triggered being useable by the terminal to redeem the first coupon or incentive information[.]" The '729 Patent, Claim 10, at 53:56-62. For example, "[t]he retailer uses Quotient's couponing services to look up the user and the coupons clipped[,]" and Quotient performs "real time and batch processing of all coupon clips and redemptions[,]" "giv[ing] instant discounts[,] redeeming the coupons directly at the POS[.]" *See* How Quotient uses MariaDB to help customers save money. Quotient uses "a distributed cache to look up coupon metadata and coupon publishing metadata" and uses MariaDB as its "primary source of this metadata. …MariaDB connections use an optimized connection pooling library to use persistent connections to the databases. *Id*. The transactions go through the messaging pipelines for batch processing and for downstream systems." *See id*. Additionally, Quotient utilizes a unique ID to authenticate, validate and trace each digital coupon. *See* Quotient Annual Report, Form 10K, December 31, 2020. The data elements used by Quotient for validation and redemption include GS1 coupon code information which may include the universal product code of the barcode information from a product to be purchased. *See, e.g*., Quotient Technology Service-Specific Terms.

52.     The Quotient promotions platforms and technologies, including the Accused Products, include computer program code configured to cause the ICN server "to receive, at the ICN server from a retail server located in a retail business located at a first location, redeemed coupon related information indicating successful redemption of a coupon, wherein the redeemed coupon related information comprises identification information from a product purchased, customer identification information, an application identifier, and retailer identification information and where the ICN server is at a second location that is remote from the first location; in response to receiving the redeemed coupon related information, to determine whether the redemption of the coupon was

valid based on the redeemed coupon related information [.]"  *See* '729 Patent, Claim 10, at 53:63-54:8.  For example, "[th]e retailer uses [Quotient's] couponing services to look up the user and the coupons clipped and gives instant discounts redeeming the coupons directly at the POS … this stack serves several million API calls per hour real time.  This simplified microservices architecture shows [Quotient's] end to end flow of transactions in one of [its] private data centers … for both real time and batch processing of all coupon clips and redemptions."  *See, e.g.,* How Quotient uses MariaDB to help customers save money.  Quotient use[s] a distributed cache to look up coupon metadata and coupon publishing metadata," where MariaDB is [its] primary source of this metadata.  …The transactions go through the messaging pipelines for batch processing and for downstream systems."  *Id*.  Quotient "execute[s] complex business rules based on the date or count for example which means [they] need to keep track of counts for each coupon periodically, updating counts automatically and run[s] rules that basically do some sort of rate limiting. …MariaDB [are] really fast at aggregate queries and updating the tables automatically."  *Id*.  Quotient "use[s] MariaDB for periodic counts for every hour for reconciliation and running some other business rules."  *Id*.  As described above, to validate coupons and promotions, Quotient uses a unique account identifier.  *See, e.g*., Quotient Annual Report, Form 10K, December 31, 2020.  Additionally, Quotient validates coupons and redemptions using a GS1 datastring, which may include a unique account identifier.  *See* Quotient Technology Service-Specific Terms, *available at* https://www.quotient.com/serviceterms/.

53.     The Quotient promotions platforms and technologies, including the Accused Products, include computer program code configured to cause the ICN server "to store, by the ICN server, the redeemed coupon related information in a redeemed coupon database, where the redeemed coupon database comprises a plurality of redeemed coupon related information received from a plurality of retailer servers."  *See* '729 Patent, Claim 10, at 54:9-14.  For example, after receiving an indication

that at least one coupon is redeemed, Quotient stores the transaction data for reconciliation and analytics in its database.  *See* How Quotient uses MariaDB to help customers save money (Quotient integrates with point of sale systems and uses MariaDB to "store[s] a[] years' worth of transactions for analytics").  Quotient "use[s] MariaDB for periodic counts for every hour for reconciliation and running some other business rules."  *Id.*

54.    Quotient also indirectly infringes the '729 patent under 35 U.S.C. § 271(b) and (c) by actively inducing and contributing to the infringement by others.

55.    For example, Quotient actively induces and has actively induced infringement of at least claim 10 of the '729 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Quotient technologies described above for installation and/or use by customers, distributors, and end users whose installation and/or use directly infringe one or more claims of the '729 patent.  Quotient encourages and instructs its customers and end users to obtain, install, configure, use, and activate the Quotient Accused Products, such as the Shopmium and Coupons.com mobile applications, with knowledge that the induced acts constitute infringement.  For example, Quotient has been and is now intentionally instructing and directing its customers and end users of Quotient's mobile applications that Quotient will customize certain promotions, discounts and coupons to those who download and utilize the applications, while instructing and directing manufacturers and advertisers that the mobile applications can be used to engage, offer and influence consumers to introduce new products, drive trial and loyalty, gain valuable consumer insights, and generate measurable sales, all while benefitting from Quotient's Digital Promotions technology.  *See, e.g.*, Quotient Announces U.S. Launch of Shopmium Cash-Back App to Enable Brands to Engage and Influence Consumers, *available at*

https://www.businesswire.com/news/home/20221026005305/en/Quotient-Announces-U.S.-Launch-of-Shopmium-Cash-Back-App-to-Enable-Brands-to-Engage-and-Influence-Consumers.

56.    Quotient does and has done the above with knowledge of the patented invention of the '729 patent, and knowing that, by doing so, the customers, distributors, and end users directly infringe.  Quotient possesses specific intent to encourage infringement by these entities and their customers. Quotient has control over the design and use of the Quotient products and services that incorporate the Accused Products described above, and Quotient possesses specific intent to cause infringement by the use of these products and services as described in more detail above.  Quotient has control over the end-user license terms and provisions thereof, which require and obligate customers, distributors, and end users to utilize the Accused Products in a manner that Quotient knows is infringing.

57.    Quotient literally or under the doctrine of equivalents infringes at least claim 10 of the '729 patent.

58.    Quotient also contributes and has contributed to the infringement of at least claim 10 of the '729 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Accused Products for installation and/or use by customers, distributors, and end users whose installation and use directly infringe one or more claims of the '729 patent.  Quotient encourages and instructs its customers and end users to infringe, with knowledge that the induced acts constitute infringement.  For example, Quotient has been and is now intentionally requiring, instructing and directing end users of its products to install the Quotient application, using push notifications to encourage use of the application, and inevitably use the infringing intelligent clearing network features of the Accused Products.

59.    As a result of Quotient's infringement of the '729 patent, Inmar has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Quotient's infringement, but in no event less than a reasonable royalty with interest and costs.

## SECOND COUNT
## (DIRECT AND INDIRECT INFRINGEMENT OF U.S. PATENT NO. 9,070,133 UNDER 35 U.S.C. § 271(a), (b) and (c) – QUOTIENT TECHNOLOGIES)

60.    Inmar incorporates by reference all of the allegations set forth in Paragraphs 0-59 of this Complaint as though fully set forth herein.

61.    Quotient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '133 patent (including without limitation claim 1) in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling, in this District and elsewhere in the United States, the Accused Products.

62.    Quotient's promotions platforms and technologies, including the Accused Products, infringe at least claim 1 of the '133 patent.  For example, Quotient's Digital Promotions architecture use master databases across datacenters, which include an intelligent clearing network server and "[a] computer-readable medium storing instructions executable by a processor to perform operations for processing coupons across a network[.]"  *See* '133 Patent, Claim 1, at 11:57-59.  Quotient's Digital Promotions architecture "serves several million API [application programming interface] calls per hour real time. This simplified microservices architecture shows our end to end flow of transactions in one of our private data centers using traditional Lambda Architecture for both real time and batch processing of all coupon clips and redemptions.  In each of the data center[s], the APIs get routed through the LB-> Apache WS -> Gateway (authentication) -> Rest/microservices. …The transactions go through the messaging pipelines for batch processing and for downstream systems." *See* How Quotient uses MariaDB to help customers save money:



63.    The Quotient promotions platforms and technologies, including the Accused Products, include a processor that is configured to receive "at a coupon processing server, a unique account identifier from a first point of sale terminal via a network, where the coupon processing server is configured to communicate with a plurality of point of sale terminals, where the unique account identifier was scanned at the first point-of-sale terminal which is located at a retail store[.]" *See* '133 Patent, Claim 1, at 11:60-66.  For example, Quotient's "computational infrastructure currently processes millions of events per day" and Quotient's "critical production infrastructure utilizes a hot failover configuration which allows [it] to switch server loads, be it a single server or an entire data center, to the other data center within minutes. …Each data center has been designed to handle more than [Quotient's] entire server needs[.]"  *See* Quotient Annual Report, Form 10K, December 31, 2020:

- *Scalable infrastructure.* We use a combination of proprietary and open-source software to achieve a horizontally scalable, global, distributed and fault-tolerant architecture, with the goal of enabling us to ensure the continuity of our business, regardless of local disruptions. Our computational infrastructure currently processes millions of events per day and is designed in a way that enables us to add significant capacity to our platforms as we scale our business without requiring any material design or architecture modifications. We use a combination of public and private cloud computing platforms. Our private cloud technology infrastructure is hosted across data centers in co-location facilities in California and Virginia.

- *Redundancy.* Our critical production infrastructure utilizes a hot failover configuration which allows us to switch server loads, be it a single server or an entire data center, to the other data center within minutes. Data is continuously replicated between sites, and multiple copies at each site provide fast recovery whenever it is requested. Each data center has been designed to handle more than our entire server needs, which enables us to perform platform maintenance, business resumption and disaster recovery without any customer impact.

*And see* How Quotient uses MariaDB to help customers save money ("this stack serves several million API calls per hour real time. This simplified microservices architecture shows our end to end flow of transactions in one of our private data centers using traditional Lambda Architecture for both real time and batch processing of all coupon clips and redemptions.").

64.     To validate coupons and promotions, Quotient uses a unique account identifier. *See, e.g.*, Quotient Annual Report, Form 10K, December 31, 2020:

### Fraud Prevention and Distribution Controls

Our platforms include a proprietary digital distribution management system to enable CPGs and retailers to securely control the number of coupons distributed by device. We have controls in place to limit the number of digital coupons that can be printed. Similar controls are in place for linking coupons to loyalty cards and other paperless solutions, which allows us to limit the number of coupons distributed and activated. In addition, each printed coupon carries a unique ID that is encrypted, enabling us to trace each coupon from print to redemption. All of our digital print coupons can be authenticated and validated using this unique code. This unique ID also can be used to detect counterfeit or altered coupons. Our platforms allow us to systematically identify and respond to fraudulent and prohibited activities by restricting a device from printing coupons. We also have a proprietary rebate distribution solution with built in authentication capabilities through phone and payment verification. We have transactional level controls across rebate portfolio to enforce stacking rules and prevent receipt alteration and/or manipulation.

65.     Additionally, Quotient validates coupons and redemptions using a GS1 datastring, which may include a unique account identifier. *See* Quotient Technology Service-Specific Terms:

- Assets – Advertiser will provide the following assets for each Promotion Campaign:
  - GS1 datastring (Dual/Blended clearinghouse barcode type)
  - Promotion Description
  - Legal Language
  - Product Image
  - Promotion Dates
  - Promotion Distribution

66.     Quotient uses a "Digital Promotions Architecture: Where the coupons user open[s] the app, clips digital coupons and does a checkout using [a] phone or loyalty card. The retailer uses our couponing services to look up the user and the coupons clipped and gives instant discounts redeeming the coupons directly at the POS without having the user to remember to bring that old paper coupon." *See* How Quotient uses MariaDB to help customers save money.  Quotient also enables users to linker their user account to a retailer loyalty card program or to a retailer online account, wherein Quotient shares and/or uses the user's loyalty card program ID or account information to collect information and review the purchase data associated with a linked account and automatically identify qualifying purchases that match any activated offers associated with the user account and apply coupons or rewards, as appropriate. *See* Shopmium US, Terms and Conditions, *available at* https://www.shopmium.com/us/terms-conditions.  After linking a loyalty account to a Quotient application, e.g. Shopmium, the user can provide the loyalty card ID, phone number or an associated payment method at the POS terminal, so that qualifying purchases made using the linked account information can be matched with activated offers. *See id*.:

F. To earn Rewards by using a Linked Account, you must first link your online retailer or loyalty card account, if available, to your User Account. After linking your Linked Account, the qualifying purchase must be made using your Linked Account Information so that the purchases are listed in your Linked Account purchase history or otherwise associated with your Linked Account (e.g. by providing your loyalty card ID, phone number, or an associated payment method at checkout in-store, or by logging into your account when making online purchases). Rewards on purchases made prior to linking a Linked Account cannot be redeemed using a Linked Account. To redeem Rewards for purchases made prior to linking your Linked Account, Rewards should be redeemed by submitting a copy of the receipt before attempting to link a retailer loyalty card program or retailer online account to your User Account. After requesting to link a retailer loyalty account or retailer online account to your User Account, receipt submissions can no longer be made for that retailer.

67.     The Quotient promotions platforms and technologies, including the Accused Products, include a "coupon processing server that is configured to communicate with a plurality of point of sale terminals[.]"  *See* '133 Patent, Claim 1, at 11:60-67.  For example, Quotient's technologies "integrat[e] with point-of-sale systems[.]" *See, e.g.*, Quotient, Deliver Savings to Consumers However They Choose to Shop, *available at* https://www.quotient.com/:

68.    The Quotient promotions platforms and technologies, including the Accused Products, include "the unique account identifier [] scanned at the first point-of-sale terminal which is located at a retail store and where the coupon processing server is at a location that is remote from the retail store[.]"  *See* '133 Patent, Claim 1, at 11:64-67.  For example, as described above, Quotient app users clip digital coupons and check out at a point-of-sale terminal using a phone or a loyalty card, and "[t]he retailer uses [Quotient's] couponing services to look up the user and the coupons clipped and gives instant discounts, redeeming the coupons directly at the POS[.]"  *See* How Quotient uses MariaDB to help customers save money.  Quotient traces each coupon "from print to redemption" using a unique account identifier that is carried by each printed coupon.  *See, e.g*., Quotient Annual Report, Form 10K, December 31, 2020.

69.    The Quotient promotions platforms and technologies, including the Accused Products, include a coupon processing server "at a location that is remote from the retail store[.]"  *See* '133 Patent, Claim 1, at 11:66-67.  For example, Quotient Digital Promotions technology infrastructure and platforms are hosted across data centers in co-location facilities in California and Virginia.  *See* Quotient Technology, 10-Q August 9, 2023 Quarterly Report; *see also* How Quotient uses MariaDB to help customers save money:



70.    The Quotient promotions platforms and technologies, including the Accused Products, include "in response to receiving the unique account identifier, determining whether at least one valid coupon is associated with the unique account identifier in a database of accounts[.]"  *See* '133 Patent, Claim 1, at 12:1-4.  For example, Quotient uses a unique account identifier to validate coupons and promotions.  *See, e.g.*, Quotient Annual Report, Form 10K, December 31, 2020.  Additionally, Quotient validates coupons and redemptions using a GS1 datastring, which may include a unique account identifier.  *See* Quotient Technology Service-Specific Terms; *see also* How Quotient uses MariaDB to help customers save money.

71.    The Quotient promotions platforms and technologies, including the Accused Products, include "in response to determining that at least one valid coupon is associated with the unique account identifier in the database of accounts, transmitting, from the coupon processing server, an indication of the at least one valid coupon to the first point of sale terminal via the network, wherein the indication includes the at least one valid coupon[.]"  *See* '133 Patent, Claim 1, at 12:5-12.  For example, after determining a coupon, associated with the unique account identifier, is valid, Quotient transmits to the point-of-sale terminal an indication that the coupon is valid.  *See, e.g.,* How Quotient

uses MariaDB to help customers save money ("The retailer uses our couponing services to look up the user and the coupons clipped and gives instant discounts redeeming the coupons directly at the POS … this stack serves several million API calls per hour real time.  This simplified microservices architecture shows our end to end flow of transactions in one of our private data centers … for both real time and batch processing of all coupon clips and redemptions.").

72.    The Quotient promotions platforms and technologies, including the Accused Products, include "in response to receiving, at the coupon processing server from the first point of sale terminal, an indication of at least one redeemed coupon, updating the database of accounts and transmitting, from the coupon processing server to a manufacturer associated with the at least one redeemed coupon, an indication that the at least one redeemed coupon was redeemed against a purchased transaction, where the at least one redeemed coupon is at least one of the at least one valid coupon." *See* '133 Patent, Claim 1, at 12:12-22.  For example, Quotient provides "self-serve capabilities," in which customers, such as manufacturers and advertisers, obtain "on-demand access" to Quotient's platform to track individual purchases and promotions validations.  *See, e.g.*, Quotient, Nestlé, Coca-Cola, Mondelez and Bimbo Bakeries Among Early Adopters for Media Measurement, July 15, 2021, *available at* https://www.quotient.com/blog/media-measurement-launch-announcement/.  "When a purchase occurs, the Quotient Analytics Platform equally spreads that purchase across all relevant impressions preceding it within the attribution window," allowing for "near real-time performance tracking" of promotions campaigns.  *Id.*; *see* How Quotient uses MariaDB to help customers save money ("Quotient Technology Inc. is a digital commerce platform, that offers digital coupons and media solutions serving hundreds of CPGs, such as Clorox, Procter & Gamble, General Mills and Kellogg's, and retailers like Albertsons Companies, CVS, Dollar General, and Walgreens, and U.S. households."); *see also* Quotient, Quotient 101, An introductory guide to Quotient Technology Inc.,

at 5, *available at* https://s24.q4cdn.com/386554049/files/doc_presentations/2021/05/Quotient-101.pdf:

> The self-service Quotient Analytics Platform gives advertisers and retailers access to near real-time insights and results to help optimize campaigns with in-flight performance measurement linked to product sales. Quotient Analytics uses point-of-sale transaction data and an advanced analytics platform to give advertisers unique visibility into their campaigns.

73.     Quotient literally or under the doctrine of equivalents infringes at least claim 1 of the '133 patent.

74.     Quotient also indirectly infringes the '133 patent under 35 U.S.C. § 271(b) and (c) by actively inducing and contributing to the infringement by others.

75.     For example, Quotient actively induces and has actively induced infringement of at least claim 1 of the '133 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Quotient technologies described above for installation and/or use by customers, distributors, and end users whose installation and/or use directly infringe one or more claims of the '133 patent.  Quotient encourages and instructs its customers and end users to obtain, install, configure, use, and activate the Quotient Accused Products, such as the Shopmium and Coupons.com mobile applications, with knowledge that the induced acts constitute infringement.  For example, Quotient has been and is now intentionally instructing and directing its customers and end users of Quotient's mobile applications that Quotient will customize certain promotions, discounts and coupons to those who download and utilize the applications, while instructing and directing manufacturers and advertisers that the mobile applications can be used to engage, offer and influence consumers to introduce new products, drive trial and loyalty, gain valuable consumer insights, and generate measurable sales, all while benefitting

from Quotient's Digital Promotions technology. *See, e.g.*, Quotient Announces U.S. Launch of Shopmium Cash-Back App to Enable Brands to Engage and Influence Consumers.

76.     Quotient does and has done the above with knowledge of the patented invention of the '133 patent, and knowing that, by doing so, the customers, distributors, and end users directly infringe. Quotient possesses specific intent to encourage infringement by these entities and their customers. Quotient has control over the design and use of the Quotient products and services that incorporate the Accused Products described above, and Quotient possesses specific intent to cause infringement by the use of these products and services as described in more detail above. Quotient has control over the end-user license terms and provisions thereof, which require and obligate customers, distributors, and end users to utilize the Accused Products in a manner that Quotient knows is infringing.

77.     Quotient also contributes and has contributed to the infringement of at least claim 1 of the '133 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Accused Products for installation and/or use by customers, distributors, and end users whose installation and use directly infringe one or more claims of the '133 patent. Quotient encourages and instructs its customers and end users to infringe, with knowledge that the induced acts constitute infringement. For example, Quotient has been and is now intentionally requiring, instructing and directing end users of its products to install the Quotient application, using push notifications to encourage use of the application, and inevitably use the infringing intelligent clearing network features of the Accused Products.

78.    As a result of Quotient's infringement of the '133 patent, Inmar has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Quotient's infringement, but in no event less than a reasonable royalty with interest and costs.

**THIRD COUNT**
**(DIRECT AND INDIRECT INFRINGEMENT OF U.S. PATENT NO. 9,098,855 UNDER 35 U.S.C. § 271(a), (b), and (c) – QUOTIENT TECHNOLOGIES)**

79.    Inmar incorporates by reference all of the allegations set forth in Paragraphs 0-78 of this Complaint as though fully set forth herein.

80.    Quotient has directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, one or more claims of the '855 patent (including without limitation claims 32, 34, 49, and 53) in violation of 35 U.S.C. § 271(a) by making, using, offering to sell, and/or selling, in this District and elsewhere in the United States, the Accused Products.

81.    Quotient's promotions platforms and technologies, including the Accused Products, infringe at least claims 32, 34, 49, and 53 of the '855 patent.  For example, Quotient's Digital Promotions architecture uses master databases across datacenters, which include "an intelligent clearing network (ICN) server" (the '855 Patent, Claim 53, at 32:56-57) comprising "an ICN database" (the '855 Patent, at 32:60) for "both real time and batch processing of all coupon clips and redemptions."  *See* How Quotient uses MariaDB to help customers save money:



82.    The Quotient promotions platforms and technologies, including the Accused Products, include a processor that "is configured to receive data elements through a network from a point-of-sale [POS] terminal of a retailer for validation and redemption" (the '855 Patent, Claim 53, at 32:58, 61-64), and further include "an interface configured to permit communications over a network to a plurality of POS terminals" (the '855 Patent, Claim 53, at 32:58-59).  For example, using Quotient's Digital Promotions architecture, "[t]he retailer uses [Quotient's] couponing services to look up the user and the coupons clipped and gives instant discounts redeeming the coupons directly at the POS without having the user to remember to bring that old paper coupon."  *See* How Quotient uses MariaDB to help customers save money.  Quotient's Digital Promotions architecture "serves several million API [application programming interface] calls per hour real time. This simplified microservices architecture shows our end to end flow of transactions in one of our private data centers using traditional Lambda Architecture for both real time and batch processing of all coupon clips and

redemptions.  In each of the data center[s], the APIs get routed through the LB-> Apache WS -> Gateway (authentication) -> Rest/microservices."  *Id*.

83.    The Quotient promotions platforms and technologies, including the Accused Products, include a processor that is configured to receive "data elements including product code information of an item to be purchased at the POS terminal and a promotion request message, where the promotion request message is scanned at the POS terminal located at a retail store[.]"  *See* '855 Patent, Claim 53, at 32:64-33:1.  For example, as described above, Quotient application users can clip digital coupons in the application and the user may use a phone at the POS terminal to have the data elements associated with clipped coupons scanned at the POS terminal.  *See* How Quotient uses MariaDB to help customers save money.  Then, "[t]he retailer uses [Quotient's] couponing services to look up the user and the coupons clipped and gives instant discounts redeeming the coupons directly at the POS…"  *Id*.  Quotient's Digital Promotions database cluster processes "~15,000 peak requests per seconds," and Quotient's Digital Promotions architecture handles "millions of API calls per hour" from retailers' POS terminals.  *Id*.  The data elements used by Quotient for validation and redemption include GS1 coupon code information which may include the UPC of the barcode information from a scanned product to be purchased.  *See, e.g*., Quotient Technology Service-Specific Terms:

- Assets – Advertiser will provide the following assets for each Promotion Campaign:
  - GS1 datastring (Dual/Blended clearinghouse barcode type)
  - Promotion Description
  - Legal Language
  - Product Image
  - Promotion Dates
  - Promotion Distribution

84.     The Quotient promotions platforms and technologies, including the Accused Products, include an ICN server "at a location that is remote from the retail store[.]"  *See* '855 Patent, Claim 53, at 32:66-33:1.  For example, Quotient Digital Promotions technology infrastructure and platforms are hosted across data centers in co-location facilities in California and Virginia.   *See* Quotient Technology, 10-Q August 9, 2023 Quarterly Report; *see also* How Quotient uses MariaDB to help customers save money:



85.     The Quotient promotions platforms and technologies, including the Accused Products, include the ICN server used "to validate the promotion request message based at least in part on the product code information, and, in response to validating the data elements at the ICN server, to send a promotion request response message that indicates whether the promotion request message has been validated."  *See* '855 Patent, Claim 53, at 33:1-8.  For example, "[t]he retailer uses Quotient's couponing services to look up the user and the coupons clipped[,]" and Quotient performs "real time and batch processing of all coupon clips and redemptions[,]" "giv[ing] instant discounts[,] redeeming the coupons directly at the POS[.]"  *See* How Quotient uses MariaDB to help customers save money. Quotient uses "a distributed cache to look up coupon metadata and coupon publishing metadata" and

uses MariaDB as its "primary source of this metadata. …MariaDB connections use an optimized connection pooling library to use persistent connections to the databases." *Id*. "The transactions go through the messaging pipelines for batch processing and for downstream systems." *See id*.

86.    Quotient literally or under the doctrine of equivalents infringes at least claims 32, 34, 49, and 53 of the '855 patent.

87.    Quotient also indirectly infringes the '855 patent under 35 U.S.C. § 271(b) and (c) by actively inducing and contributing to the infringement by others.

88.    For example, Quotient actively induces and has actively induced infringement of at least claim 53 of the '855 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Quotient technologies described above for installation and/or use by customers, distributors, and end users whose installation and/or use directly infringe one or more claims of the '855 patent. Quotient encourages and instructs its customers and end users to obtain, install, configure, use, and activate the Quotient Accused Products, such as the Shopmium and Coupons.com mobile applications, with knowledge that the induced acts constitute infringement. For example, Quotient has been and is now intentionally instructing and directing its customers and end users of Quotient's mobile applications that Quotient will customize certain promotions, discounts and coupons to those who download and utilize the applications, while instructing and directing manufacturers and advertisers that the mobile applications can be used to engage, offer and influence consumers to introduce new products, drive trial and loyalty, gain valuable consumer insights, and generate measurable sales, all while benefitting from Quotient's Digital Promotions technology. *See, e.g.*, Quotient Announces U.S. Launch of Shopmium Cash-Back App to Enable Brands to Engage and Influence Consumers.

89.    Quotient does and has done the above with knowledge of the patented invention of the '855 patent, and knowing that, by doing so, the customers, distributors, and end users directly infringe.  Quotient possesses specific intent to encourage infringement by these entities and their customers. Quotient has control over the design and use of the Quotient products and services that incorporate the Accused Products described above, and Quotient possesses specific intent to cause infringement by the use of these products and services as described in more detail above.  Quotient has control over the end-user license terms and provisions thereof, which require and obligate customers, distributors, and end users to utilize the Accused Products in a manner that Quotient knows is infringing.

90.    Quotient also contributes and has contributed to the infringement of at least claim 53 of the '855 patent, literally or under the doctrine of equivalents, by making, manufacturing, testing and otherwise using, licensing, selling and offering to sell, and distributing Accused Products for installation and/or use by customers, distributors, and end users whose installation and use directly infringe one or more claims of the '855 patent.  Quotient encourages and instructs its customers and end users to infringe, with knowledge that the induced acts constitute infringement.  For example, Quotient has been and is now intentionally requiring, instructing and directing end users of its products to install the Quotient application, using push notifications to encourage use of the application, and inevitably use the infringing intelligent clearing network features of the Accused Products.

91.    As a result of Quotient's infringement of the '855 patent, Inmar has suffered monetary damages, and seeks recovery in an amount adequate to compensate for Quotient's infringement, but in no event less than a reasonable royalty with interest and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Inmar prays for judgment and seeks relief against Quotient as follows:

A.     For judgment that Quotient has infringed one or more claims of the Patents-in-Suit, directly, and/or indirectly by way of inducement or contributory infringement;

B.     For judgment awarding Inmar damages adequate to compensate it for Quotient's infringement of the Patents-in-Suit, including all pre-judgment and post-judgment interest;

C.     For judgment that Quotient has willfully infringed one or more claims of the Patents-in-Suit;

E.     For judgment awarding enhanced damages pursuant to 35 U.S.C. § 284;

F.     For judgment awarding attorneys' fees pursuant to 35 U.S.C. § 285 or otherwise permitted by law;

G.     For judgment awarding costs of suit; and

H.     For judgment awarding Inmar such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure Inmar hereby demands a trial by jury of this action.

ASHBY & GEDDES

*/s/ Andrew C. Mayo*

_____

John G. Day (#2403)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
jday@ashbygeddes.com
amayo@ashbygeddes.com

*Attorneys for Plaintiff*

*Of counsel*:

Denise M. De Mory
Marc Belloli
Li Guo
Brenda Entzminger
BUNSOW DE MORY LLP
701 El Camino Real
Redwood City, CA 94063
(650) 351-7248

Dated:  September 7, 2023