IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **INMAR BRAND SOLUTIONS, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO. 23-994** |
| | : | |
| **QUOTIENT TECHNOLOGY INC.** | : | |

## MEMORANDUM

**MURPHY, J.**                                                                                                **April 18, 2024**

At the outset of this case, Quotient Technology asks us to hold that patents exclusively licensed by Inmar Brand Solutions are ineligible for patent protection. We must decide whether the patent claims are directed to ineligible subject matter under the Supreme Court's two-step test in *Alice Corp. v. CLS Bank International*, 573 U.S. 208 (2014).

To answer this question, we start by considering the parties' dueling characterizations of the claimed invention. Reducing a patent claim to an idea is easy enough — anyone can do it. But the question is whether the sweep of that boiled-down phrase really makes sense in light of the record. And as many courts have observed, the analytical magic is not so much in the presence or absence of an "abstract idea" as it is in the "directed to" requirement. The latter focus often requires comparing the proposed abstract idea to the claim language, and doing so with a careful eye on the purported advance over the prior art. This case strays near to the Federal Circuit's borderline, but Quotient has not persuaded us that these patents on coupon-clearing technology are invalid. Inmar's patent claims are not directed to the oversimplified abstract idea that Quotient proposes. Rather, they are directed to the non-abstract idea of processing coupons with a computer system configured in a particular way to overcome flaws in prior art systems. The system's configuration reduces coupon fraud and facilitates coupon clearing in ways that humans cannot. Therefore, we deny Quotient's motion.

I. **Background**

Inmar is in the coupon-processing technology business. *See* DI 1 ¶¶ 12-13. It is the exclusive licensee of a patented coupon-processing system developed by Intelligent Clearing Network, Inc. (ICN). *See id.* ¶¶ 14, 16. The asserted patents are United States Patent Nos.

- 10,846,729 ("**the 729 patent**," entitled "Intelligent Clearing Network"), *id.* ¶ 17,

- 9,070,133 ("**the 133 patent**," entitled "Intelligent Coupon Network"), *id.* ¶ 24, and

- 9,098,855 ("**the 855 patent**," entitled "Intelligent Clearing Network"), *id.* ¶ 32.

*See also id.* ¶ 16.[1] Inmar claims that Quotient is infringing the asserted patents. *See generally id.*

The asserted patents have specifications that are materially similar for purposes of this motion. And there are three representative claims.[2] Claim 10 of the 729 patent recites:

> An ICN [Intelligent Clearing Network] server comprising a processor; and a memory including computer program code, the memory and the computer program code configured to, with the processor, cause the ICN server to perform at least the following:
>
> to receive, at an ICN server, first coupon or incentive information including universal product code information of an item to be purchased at a retail business, the first coupon or incentive related information having been input to a terminal in the retail business, the ICN server being at a location that is remote from the retail business;
>
> to validate, at the ICN server, the first coupon or incentive related

---

[1] The U.S. Patent and Trademark Office issued the 729 patent on November 24, 2020, the 133 patent on June 30, 2015, and the 855 patent on August 4, 2015. DI 1 ¶¶ 17, 24, 32.

[2] Inmar does not meaningfully dispute Quotient's selection of representative claims. DI 24 at 1 n.1 (citing *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018)). Inmar even relies on the same claims in its opposition. *See* DI 18 at 6 n.10.

> information by performing a comparison of the first coupon or incentive related information based at least in part on the universal product code information;
>
> to transmit from the ICN server, in response to validation of the first coupon or incentive related information, coupon or incentive codes triggered by the validation of the first coupon or incentive related information, the coupon or incentive codes triggered being useable by the terminal to redeem the first coupon or incentive information;
>
> to receive, at the ICN server from a retail server located in a retail business located at a first location, redeemed coupon related information indicating successful redemption of a coupon, wherein the redeemed coupon related information comprises identification information from a product purchased, customer identification information, an application identifier, and retailer identification information and where the ICN server is at a second location that is remote from the first location; in response to receiving the redeemed coupon related information, to determine whether the redemption of the coupon was valid based on the redeemed coupon related information; and
>
> to store, by the ICN server, the redeemed coupon related information in a redeemed coupon database, where the redeemed coupon database comprises a plurality of redeemed coupon related information received from a plurality of retailer servers.

*Id.* Ex. 1 col. 53 ll. 41-67, col. 54 ll. 1-13. Claim 1 of the 133 patent recites:

> A computer-readable medium storing instructions executable by a processor to perform operations for processing coupons across a network, the operations comprising:
>
> receiving, at a coupon processing server, a unique account identifier from a first point of sale terminal via a network, where the coupon processing server is configured to communicate with a plurality of point of sale terminals, where the unique account identifier was scanned at the first point-of-sale terminal which is located at a retail store and where the coupon processing server is at a location that is remote from the retail store;
>
> in response to receiving the unique account identifier, determining whether at least one valid coupon is associated with the unique account identifier in a database of accounts;

> in response to determining that at least one valid coupon is associated with the unique account identifier in the database of accounts, transmitting, from the coupon processing server, an indication of the at least one valid coupon to the first point of sale terminal via the network, wherein the indication includes the at least one valid coupon;
>
> in response to receiving, at the coupon processing server from the first point of sale terminal, an indication of at least one redeemed coupon, updating the database of accounts and transmitting, from the coupon processing server to a manufacturer associated with the at least one redeemed coupon, an indication that the at least one redeemed coupon was redeemed against a purchased transaction,
>
> where the at least one redeemed coupon is at least one of the at least one valid coupon.

*Id.* Ex. 2 col. 11 ll. 57-67, col. 12 ll. 1-22. And claim 32 of the 855 patent recites:

> A method for processing at least one of coupons and incentives, comprising:
>
> scanning via a first interface, first coupon or incentive related information at a terminal located at a retail store, the first coupon or incentive related information including universal product code information of an item to be purchased;
>
> transmitting, via a second interface, the first coupon or incentive related information through a network to a coupon or incentive processing server for validation and redemption, where the first interface is different from the second interface, and where the coupon or incentive processing server is located remotely from the retail store; and
>
> in response to the first coupon or incentive related information being validated at the coupon or incentive processing server based at least in part on the universal product code information, receiving, via the second interface, second coupon related information through the network to the terminal, where the second coupon related information indicates whether the coupon or incentive processing server has validated the first coupon related information.

*Id.* Ex. 3 col. 30 ll. 38-60.

Generally speaking, the technology involves computer systems for clearing coupons, and the claims specify how those systems are configured or how they operate. Inmar draws our

4

attention to several important aspects of the asserted patents.  For starters, the coupon-processing server — i.e., the ICN server — is at a different location than the retail stores where transactions involving coupons occur.  *Id.* Ex. 1 col. 54 ll. 3-4; *id.* Ex. 2 col. 11 ll. 66-67; *id.* Ex. 3 col. 30 ll. 49-51.  "The ICN server is accessible via a retailer's wide area or other network . . . and has an ICN promotion redemption service (PRS) installed and running in real time to accept connections over a configured listening transfer control protocol port."  *Id.* Ex. 1 col. 6 ll. 49-54.  The retail store's point-of-sale terminal transmits coupon data to its own point-of-sale "controller," which then transmits the data to the remote ICN server "for coupon redemption, validation, and financial settlement."  *Id.* Ex. 1 col. 2 ll. 9-10.  "The ICN server executes software applications that process coupons for one or more manufacturers who have transacted with the owner of the ICN server to provide such processing."  *Id.* Ex. 3 col. 4 ll. 27-30; *see also id.* Ex. 3 col. 4 ll. 35-36 ("[A] plurality of manufacturer servers may be configured to communicate with the ICN server.").

 Upon validating the coupon, the ICN server "transmit[s] second coupon information through the network to the [point-of-sale] terminal."  *Id.* Ex. 2 col. 1 ll. 51-52.  The point-of-sale terminal then sends "redeemed coupon related information" back to the ICN server to validate and store the redeemed coupon data.  *Id.* Ex. 1 col. 53 ll. 64-65, col. 54 ll. 7-14.  The system for redeeming the coupons is generally depicted in the figure below.



*Id.* Ex. 1 fig. 1.

The asserted patents purport to improve the efficiency, speed, and security of coupon processing. *Id.* ¶ 15; *see id.* Ex. 1 col. 13 ll. 58-62. For example, the system allows for identification of "[a]bnormal transaction volumes from a particular store . . . to prevent store personnel and/or others from fraudulently redeeming coupons for personal gain, to meet or exceed sales goals, and the like." *Id.* Ex. 1 col. 14 ll. 44-48. Moreover, the ICN server can generate notifications to retail stores for "alert event[s]" — events "deemed important enough to warrant a quick notification" — such as "when a threshold number of manual inputs of coupon information indicates a potential point-of-sale device failure." *Id.* Ex. 1 col. 44 ll. 59-67, col. 45 ll. 1-15.

**II.        Quotient's Motion to Dismiss**

Quotient argues that the asserted patents claim ineligible subject matter. *See generally* DI 10. Applying step one of *Alice*, Quotient asserts that patent claims are directed to "the abstract idea of validating and processing coupons (or incentives) using a remote server." *Id.* at 8.

Turning to step two of *Alice*, Quotient argues that Inmar's claims "recite solely generic computer components" and do not claim an inventive concept. *Id.* at 15-16.

Inmar responds that the asserted patents do not claim patent-ineligible subject matter because of the coupon-clearing system's architecture. DI 18 at 18. Under *Alice* step one, Inmar argues that "the change in *where* and *how* the coupons are verified and redeemed is an improvement in computer functionality with numerous benefits." *Id.* at 16. Under *Alice* step two, Inmar argues that the coupon-clearing system — which "process[es] the first coupon related information at the point of sale before transmitting it to a remote server for validation" — adds an inventive concept. *Id.* at 19-20. Inmar also points out that some of the claims issued over § 101 rejection post-*Alice*. *Id.* at 7; *see* DI 19-2.

In reply, Quotient tries distinguishing the caselaw Inmar relies on. *See generally* DI 24. Quotient rejects Inmar's take on the purported "improvement to existing technology" — arguing that Inmar's patents "claim '[using] computers as a tool' to improve an existing business process." DI 24 at 3 (alteration in original) (quoting *Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1361-62 (Fed. Cir. 2023)). And Quotient argues that we should disregard Inmar's reliance on the Patent Office's treatment of the asserted patents. *Id.* at 8-9.

We have subject-matter jurisdiction. *See* 28 U.S.C. § 1331. We heard oral argument on Quotient's motion. *See* DI 26-27. The motion is ripe for disposition. For the reasons explained below, we deny Quotient's motion.

**III.** **Standard of Review**

"[P]atent eligibility can be determined at the Rule 12(b)(6) stage." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018). "A district court's

7

determination of patent eligibility under § 101 is an issue of law . . . and may contain underlying issues of fact." *Endo Pharms. Inc. v. Teva Pharms. USA, Inc.*, 919 F.3d 1347, 1352 (Fed. Cir. 2019); *see CosmoKey Solns. GmbH & Co. KG v. Duo Security LLC*, 15 F.4th 1091, 1095 (Fed. Cir. 2021). We "tak[e] the allegations of the complaint to be true" at the motion to dismiss stage. *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1347 (Fed. Cir. 2016); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Lutz v. Portfolio Recovery Assocs., LLC*, 49 F.4th 323, 327-28 (3d Cir. 2022).

## IV. Analysis

Step one of the *Alice* analysis is "'determin[ing] whether the claims at issue are directed to a patent-ineligible concept,' such as an abstract idea." *CosmoKey*, 15 F.4th at 1096 (quoting *Alice*, 573 U.S. at 218). "The abstract idea exception prevents patenting a result where 'it matters not by what process or machinery the result is accomplished.'" *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (quoting *O'Reilly v. Morse*, 56 U.S. 62, 113 (1854)). The concern "driv[ing] this exclusionary principle" is preemption — where granting a monopoly over an abstract idea "might tend to impede innovation more than it would tend to promote it." *Alice*, 573 U.S. at 216 (internal quotation marks omitted) (quoting *Mayo Collaborative Servs. v. Prometheus Laboratories, Inc.*, 566 U.S. 66, 71 (2012)); *see also CosmoKey*, 15 F.4th at 1100 (Reyna, J., concurring) ("Of course, preemption is a primary underlying concern, but so are the concepts of inventiveness and innovation.").

The Supreme Court in *Alice* did not "delimit the precise contours" of what it means to fall

in the "'abstract ideas' category." *Alice*, 573 U.S. at 221. But since *Alice*, the Federal Circuit has endeavored to explain how to decide whether a claim is "directed" to an abstract idea. "[T]he inquiry calls upon [courts] to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). Often times, framing the claims against the prior art serves to bring the § 101 analysis into clearer view.

Determining the focus of the claimed advance over prior art may require analysis of "'the language of the [a]sserted [c]laims themselves' [and] the specification," and may even "require claim construction" or "looking to the specification to understand 'the problem facing the inventor.'" *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767 (Fed. Cir. 2019) (citation omitted) (first quoting *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016); then quoting *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016)). "[W]hile the specification may help illuminate the true focus of a claim, when analyzing patent eligibility, reliance on the specification must always yield to the claim language in identifying that focus." *Id.* at 766; *see also Trinity Info Media*, 72 F.4th at 1363 ("Our focus is on the claims, as informed by the specification."). At bottom, we must "articulate what the claims are directed to with enough specificity to ensure the step one inquiry is meaningful." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1347 (Fed. Cir. 2017).

An abstract idea is often at issue when the focus of the claimed advance is "a method of organizing human activity." *Alice*, 573 U.S. at 220. But just because a "claimed system achieves automation of a task previously performed by humans . . . does not mean the claimed system is necessarily directed to an abstract idea." *EcoServices, LLC v. Certified Aviation*

9

*Servs., LLC*, 830 F. App'x 634, 643 (Fed. Cir. 2020). For example, in *EcoServices*, the Federal Circuit held that a patent was directed to the non-abstract idea of "an improved system for washing jet engines," rather than "the mere desired *result* of automated jet engine washing." *Id.* at 642 (emphasis added). The jet engine washing system had advantages that the prior art — "human-operated washing systems" — lacked: "a higher degree of quality of an engine washing procedure, a minimized risk of wrongly operated equipment, a higher degree of safety, and cost efficiency and reliability." *Id.* (cleaned up). These advantages supported the Federal Circuit's conclusion that "the claims provide a technical improvement to jet engine washing." *Id.* at 643.

Also relevant to the "step one" decision in *EcoServices* was the "specific combination" of components in the washing system, such that the composition "create[d] technical improvements to systems for washing jet engines." *Id.* The Federal Circuit has applied that same principle to — for example — an inertial tracking system that situated its components "in a non-conventional manner to reduce errors." *E.g.*, *Thales*, 850 F.3d at 1348-49. In *Thales*, the patent claimed the unorthodox positioning of "inertial sensors." *Id.* at 1344-45. Inertial sensors are used for applications such as "aircraft navigation and virtual reality simulations." *Id.* at 1345. The claimed advance was the sensors' "particular arrangement." *Id.* at 1348. The non-conventional arrangement created, among other benefits, increased accuracy in "measur[ing] the tracked object on the moving frame." *Id.* at 1345; *see id.* at 1348. The Federal Circuit concluded the "mathematical equations" that a challenger argued invalidated the patent "are a consequence of the arrangement of the sensors and the unconventional choice of reference frame in order to calculate position and orientation." *Id.* at 1349.

But "a telltale sign of abstraction is when the claimed functions are mental processes that

10

can be performed in the human mind or using a pencil and paper." *Trinity Info Media*, 72 F.4th at 1361-62 (cleaned up).  For example, in *Trinity Info Media*, the Federal Circuit held that a "poll-based networking system that connects users based on similarities as determined through poll answering and provides real-time results to the users" was directed to the abstract idea of "matching based on questioning." *Id.* at 1358, 1362.  The patent's specifications "frame[d] the inventor's problem in terms of how to improve existing polling systems . . . [and] *not* how to improve computer technology." *Id.* at 1363 (emphasis added).  And "the asserted claims [did] not require specialized computer components" and were not "directed to a technological improvement in computer or mobile phone functionality." *Id.* at 1364.  The court concluded that "plac[ing] the abstract idea in the context of a distributed networking system . . . [did] not change the focus of the asserted claims from an abstract idea." *Id.* at 1365; *see also ChargePoint*, 920 F.3d at 768-69 (holding claims were directed to "the abstract idea of communication over a network for interacting with a device, applied to the context of electric vehicle charging stations" because the claim language "would preempt the use of any networked charging stations"); *Ficep Corp. v. Peddinghouse Corp.*, 2023 WL 5346043, at *3 (Fed. Cir. Aug. 21, 2023) (holding the "focus of the claimed advance" was "automating a previously manual process of transferring information from a CAD design model to a manufacturing machine").

As one might expect, the parties offer competing characterizations of what the focus of the claimed advance is in the asserted patents.  Quotient argues that the claims are directed to the abstract idea of "validating and processing coupons (or incentives) using a remote server." DI 10 at 8; *see* DI 27 at 20-21.  Inmar argues "the asserted patents claim an improved existing coupon processing architecture, which eliminates the prior processes, and replaces them with

11

substantively different processes that significantly reduce fraud and could not be accomplished by humans." DI 18 at 17.  We lean towards Inmar's characterization; the focus of the claimed advance is validating and processing coupons through the use of a remote server that has advantages that humans cannot provide, like the reduction of coupon fraud, because of its purportedly novel configuration.

We reach this conclusion for a few reasons.  First, just because Inmar's coupon-processing system does something that humans can do — *theoretically* — does not automatically make the focus of its claimed advance an abstract idea.  The Federal Circuit's analysis in *EcoServices* is instructive.  Just as humans were perfectly capable of washing jet engines in *EcoServices*, humans can process coupons.  The asserted patents' specifications discuss the physical (rather than electronic) coupon-clearing process.  *See, e.g.*, DI 1 Ex. 1 col. 1 ll. 46-49 (the "physical coupon clearing process . . . can be slow and manual and sometimes requires a second independent count of each paper coupon before a retailer is reimbursed.").  But the court in *EcoServices* exercised caution in distinguishing between claims directed to improving the *result* of a human-driven process, versus a non-abstract improvement of the process itself.  Similar to the claimed advancements of the jet engine washing system, the asserted patents claim improvements to the way in which coupons are cleared (or, interchangeably, the systems that implement that way).  Particularly, the claimed system makes clearing coupons more efficient and less prone to error through the use of the remote server that can accurately process coupons, detect fraud, and communicate between multiple manufacturers and retailers in real-time.  Thus, we disagree with Quotient's argument that the asserted patents claim in "purely 'result-based functional language.'" DI 10 at 14 (quoting *Two-Way-Media Ltd. v. Comcast Cable Comm'cns,*

12

*LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017)).

Second, and relatedly, the claimed system has a non-conventional configuration. Like the setup of inertial sensors in *Thales*, the composition of the system described in the asserted patents is directed to a "new and useful technique . . . to more efficiently" clear coupons and detect fraudulent transactions. *Thales*, 850 F.3d at 1349. The location and programming of the ICN server enables coupon processing in real time for "a plurality of manufacturers." DI 1 Ex. 3 col. 4 ll. 35-36. The architecture allows for the storage of redeemed coupons received "from a plurality of retailer servers." *Id.* Ex. 1 col. 54 ll. 9-13; *see also id.* Ex. 1 col. 45 ll. 56-57 ("[Connection to the central ICN system] would allow a myriad of retailers and systems to all be connected and operate as one."). And the remote ICN server is capable of generating real-time "alert event" notifications for multiple retailers in multiple instances that are indicative of fraudulent couponing. *See id.* Ex. 1 col. 45 ll. 1-27. Thus, the non-conventional setup in the asserted patents adds benefits to the coupon-clearing process similar to those added by the sensor positioning in *Thales* — namely, error reduction.

Third, although we agree with Quotient that the asserted patents do not claim a technical improvement *of a computer*, that is not the *per se* test for patent eligibility. On this point, Inmar relies heavily on the Federal Circuit's decision in *Ancora Technologies, Inc. v. HTC America, Inc.*, to argue that the asserted patents claim a technological improvement by locating the ICN server remotely. *See* DI 18 at 15 (citing 908 F.3d 1343 (Fed. Cir. 2018)). Inmar likens the difference in location of the ICN server to the change in location of software inside the computer in *Ancora* — a change that the Federal Circuit said improved the computer's security features and ultimate made it patent-eligible. *Id.* at 16 (discussing *Ancora*).

13

*Ancora* is not a perfect fit because the asserted patents are less directed to improving a problem in the software or hardware of a particular computer but rather focus on improving an overall system. Inmar may have relied so much on *Ancora* because, "[i]n the context of software-based inventions, *Alice/Mayo* step one 'often turns on whether the claims focus on the specific asserted improvement in computer capabilities or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool.'" *Trinity Info Media*, 72 F.4th at 1362-63 (quoting *In re Killian*, 45 F.4th 1373, 1382 (Fed. Cir. 2022)). And indeed, Inmar's asserted patents involve ICN's software. *See, e.g.*, DI 1 Ex. 1 col. 53 ll. 41-44. However, the focus of the claimed advance in the asserted patents is not an upgrade to the capabilities *of a computer*. Neither the plain language of the claims nor the asserted patents' specifications support this conclusion — making reliance on *Ancora* inapposite.

*Ancora*'s mismatch here does not mean the assert patents have an abstract focus, because again, the invention lies in the purportedly novel configuration of the overall system, which even counsel for Quotient had to acknowledge at oral argument is a way to establish patent eligibility.[3] Quotient relies heavily on the Federal Circuit's reasoning in *Trinity Info*, *Ficep*, and *ChargePoint*, to argue that the asserted patents claim nothing more than "sending, receiving, validating, and processing information" in the absence of a technological improvement. *See* DI

---

[3] *See* DI 27 at 11 ll. 16-25, 12 ll. 1-4 (Q. "I'm sure we'll need to talk more about the nature of the innovation of moving the server remotely, but at least as a starting principle, it sounds like you would agree with me that you can have a patent-eligible invention where the technological aspect is the rearranging of conventional computer components, as opposed to changing one of those computer components?" A. "*Yes, and . . . [a]nd we've seen cases like that . . . .*" (emphasis added)).

10 at 10-11, 14; *see also* DI 24 at 3-4.[4]  Each case is distinguishable.

Unlike *Trinity Info*, the representative claims of the asserted patents claim an unconventional system configuration — as previously discussed.  The Federal Circuit in *Trinity Info* was unpersuaded "that the purported 'non-traditional design'" argument made by the patent holder meant that "the *asserted* claims [were] not directed to an abstract idea" because the unconventional design component of the patent was found in a dependent claim.  *Trinity Info*, 72 F.4th at 1364-65.  But here, the non-traditional design recited in the representative claims makes improvements over the ability of preexisting coupon-clearing architecture to detect fraudulent transactions.

The same rationale applies when contrasting *ChargePoint*, where "the specification" of patents claiming a communication network for electronic vehicles did "*not* suggest that the inventors' discovery was the particular arrangement of components claimed."  *ChargePoint*, 920

---

[4] Although there's no shortage of Federal Circuit decisions applying § 101, Quotient also relies on the District of Delaware's decision in *BNP Holdings LLC v. Intuit Inc.*  *See* DI 10 at 18-19 (citing 2023 WL 6621363 (D. Del. Oct. 11, 2023)).  Quotient argues that the "claimed 'movement' of coupon processing . . . from the retail store to a remote 'server at best is merely rearranging an abstract idea,' and [is] certainly not 'inventive.'"  *Id.* at 19 (quoting *BNP Holdings*, 2023 WL 6621363, at *19).
   Our initial observation from Quotient's argument is that the language it relies on is extracted from *BNP Holding*'s discussion of step *two* of *Alice* — thus slightly misplaced.  True, there is inevitably some slippage between *Alice* steps one and two.  But we must take each step in turn to ensure "that the first-stage filter is a meaningful one."  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016).
   Further, the claimed advance held to be patent ineligible in *BNP Holdings* is meaningfully different than the claimed advance of the asserted patents.  The court in *BNP Holdings* concluded that patent claims involving a billing system were "directed to fundamental economic practices involving simple information exchange."  *BNP Holdings*, 2023 WL 6621363, at *5.  The court said that the patentee did "not identif[y] . . . how the patent has improved the functionality of the [billing] *network* or computer itself."  *Id.* (emphasis added).  Here, on the other hand, Inmar has explained how the architecture detailed in the asserted patents improves the functionality of coupon-clearing technology.

F.3d at 772 (emphasis added).  Unlike the inventors in *ChargePoint* — who the Federal Circuit said did *not* claim "the combination of . . . components as their invention" — Inmar persuasively argues that the architecture claimed in the asserted patents makes their focus non-abstract.  *Id.*

Lastly, in *Ficep*, the Federal Circuit carefully delineated between the focus of the claims at issue and the claims in — for example — *EcoServices* and *Thales*, which "recited specific *means* for technological improvements."  *Ficep*, 2023 WL 5346043, at *5 (emphasis added).  While the patentee in *Ficep* argued that the claims "require[d] a novel means of garnering the intersection parameters for an object" in way that differed from humans, "the relevant aspect of the claims" did not say so.  *Id.* at *4.  But here, the relevant aspect of the claims details the means by which the coupon-clearing system improves on prior art through its unconventional arrangement.

V.     **Conclusion**

We hold that Inmar does not claim patent-ineligible subject-matter under step one of *Alice*.  For that reason, we will not proceed to step two of *Alice*.  *See Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) ("If the claims are directed to a patent-eligible concept, the claims satisfy § 101 and we need not proceed to the second step.").  Therefore, we deny Quotient's motion to dismiss.